**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

ROBERT BRADEN,

          Plaintiff,

   v.

LOCKHEED MARTIN CORP.,

          Defendant.

Civil No. 14-4215(RMB/JS)

**OPINION**

APPEARANCES:

Rahul Munshi, Esq. (*pro hac vice*)
Laura C. Mattiacci, Esq.
Susan M. Saint-Antoine, Esq.
Emily Rose Derstine Friesen, Esq.
Console Mattiacci, LLC
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
-and-
Stephen G. Console, Esq.
Megan Knowlton Balne, Esq.
Console Mattiacci, LLC
110 Marter Ave, Suite 105
Moorestown, NJ 08057
    *Attorneys for Plaintiff*.

Anjanette Cabrera, Esq.
Constangy, Brooks, Smith & Prophete
620 Eighth Avenue, 38th Floor
New York, NY 10018
-and-
Tamika Nordstrom, Esq, (*pro hac vice*)
Constangy, Brooks, Smith & Prophete

230 Peachtree Street, NW, Suite 2400
Atlanta, GA 30303
-and-
Rodrick D. Holmes, Esq. (*pro hac vice*)
Constangy, Brooks, Smith & Prophete
6000 Poplar Avenue, Suite 250
Memphis, TN 38119
-and-
Michael Gaston-Bell, Esq. (*pro hac vice*)
Constangy, Brooks, Smith & Prophete
Kansas City, MO 64108
-and-
Kannon K. Shanmugam, Esq. (*pro hac vice*)
Williams & Connolly LLP,
725 12th Street, N.W.
Washington, DC 20005
  *Attorneys for Defendant*.

  BUMB, United States District Judge:

  At the close of a four-day trial, a jury found that

Defendant Lockheed Martin Corp. ("Defendant" or "Lockheed")

discriminated against Plaintiff Robert Braden ("Plaintiff" or

"Braden") on the basis of age, in violation of the Age

Discrimination in Employment Act, as amended, 29 U.S.C. §

621, et seq. ("ADEA"), and the New Jersey Law Against

Discrimination, N.J.S.A. § 10:5-1, et seq. (the "NJLAD"). The

jury awarded Plaintiff $520,000 for lost wages and benefits,

$520,000 for emotional distress, and $50,000,000 in punitive

damages.[1]

---

[1] The Plaintiff was also awarded $520,000 in liquidated damages
pursuant to the ADEA, 29 U.S.C. § 626(b), and $4,212.00 in

This matter now comes before the Court upon the filing of an omnibus post-trial Motion by Defendant seeking judgment as a matter of law as to both liability and damages pursuant to Fed. R. Civ. P. 50(b), a New Trial pursuant to Fed. R. Civ. P. 59, or Remittitur of the jury's emotional distress and punitive damages awards. For the reasons set forth below, Defendant's Motion for Judgment as a Matter of Law shall be DENIED, Defendant's Motion for a New Trial shall be GRANTED, in part, and DENIED, in part, and Defendant's Motion for Remittitur of emotional damages shall be DENIED. Because the Court grants Defendant's motion for a new trial on the issue of punitive damages, it need not reach Defendant's motion to remit the punitive damages award.

**I.    Background**

a. Procedural Background

On July 2, 2014 Plaintiff filed a two-count complaint alleging that Lockheed terminated his employment because of his age, in violation of the ADEA and the NJLAD. This Court has jurisdiction over plaintiff's ADEA claim pursuant to 28 U.S.C. § 1331 and exercises supplemental jurisdiction over plaintiff's NJLAD claim pursuant to 28 U.S.C. § 1367(a).

---

prejudgment interest. These awards are not the subject of Defendant's omnibus motion.

Lockheed moved for summary judgment on October 20, 2015, seeking dismissal of Plaintiff's discrimination claims on two bases. First, Defendant argued that Plaintiff could not establish a prima facie case of age discrimination under the framework initially set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).[2] Specifically, Lockheed argued that the evidence of record was insufficient to establish that a similarly situated younger person was retained or hired to fill Plaintiff's position. <u>See</u> <u>Anderson v. Consol. Rail Corp.</u>, 297 F.3d 242, 249 (3d Cir. 2002). Second, Lockheed contended that even had Plaintiff established a prima facie case of age discrimination, Lockheed had proffered a legitimate, non-discriminatory business reason for terminating Plaintiff -- current or projected lack of work -- and Plaintiff had failed to establish that such reason was pretextual.

On May 11, 2016, this Court issued a Memorandum Order denying summary judgment, finding that (i) whether employees retained by Lockheed were sufficiently "similarly situated" to Plaintiff was a genuinely disputed issue of fact which a jury

---

[2] As will be discussed further below, claims of age discrimination under the ADEA and the NJLAD are evaluated under the same framework. <u>See, e.g.</u>, <u>Bergen Commercial Bank v. Sisler</u>, 157 N.J. 188, 200 (1999).

4

should resolve, and (ii) Plaintiff had identified sufficient evidence of pretext to survive summary judgment. (Dkt. No. 35). Lockheed filed a motion for reconsideration on May 23, 2016, which this Court denied on July 28, 2016. (Dkt. No. 39).

On January 6, 2017, Lockheed filed two motions in limine seeking to exclude various evidence and testimony and to bifurcate the issues of liability and damages at trial. Among other things, Lockheed sought to exclude testimony regarding an age discriminatory remark allegedly made by Jay Hansen, Plaintiff's direct manager's (James Judd) manager at the time of the alleged comment, about "getting rid" of Plaintiff, as well as testimony from Plaintiff regarding the emotional distress he suffered as a result of his termination. With regard to Hansen's statement, Lockheed argued that it was alleged to have been made so long before Plaintiff's termination that it could not possibly be relevant, and that even if it were relevant it was unduly prejudicial. With regard to Plaintiff's testimony regarding his emotional distress, Lockheed argued that Plaintiff, as a lay person, was not competent to testify regarding what Lockheed qualified as medical diagnoses, and that any such testimony would be unduly prejudicial.

The Court held oral argument on the Defendant's motions on January 19, 2017. At that hearing, the Court made several

rulings, one of which is relevant to the pending motions. As is discussed in greater detail below, the Court denied Lockheed's request to exclude testimony regarding Jay Hansen's alleged comment about "getting rid" of Plaintiff, holding, in general, that the comment set the gears of discrimination in motion, and the jury could decide what weight to give the testimony, if any. (1/19/17 Oral Arg. Tr. at 7:17-8:25).

A jury trial was held from January 23, 2017 through January 26, 2017. Plaintiff called three witnesses: Dennis Gillespie, a Human Resources Business Partner for Lockheed at the time Plaintiff worked there; Christopher Kebalo, a Director with oversight of the unit in which Plaintiff worked; and Plaintiff himself. Plaintiff also relied on various documentary evidence, which constituted a significant portion of his case and much of which is described in further detail below. At the close of the Plaintiff's case-in-chief, Defendant moved for judgment as a matter of law under Fed. R. Civ. P. 50. Defendant argued that Plaintiff had failed to present evidence sufficient for a reasonable jury to find that Lockheed had retained a similarly situated younger employee when it terminated Plaintiff. (Trial Transcript "Tr." 295:5-7). The Court denied the motion, finding that Plaintiff had presented sufficient evidence to warrant submission of the case to the jury.

Defendant called James Judd, Plaintiff's manager from the early 2000s; Hansen, the upper-level manager from Lockheed whom Plaintiff alleged had made age-related comments about Plaintiff; Gillespie, the Human Resources Business Partner; Christopher Renna, the manager of Plaintiff's unit at the time of his termination and the individual who selected Plaintiff for termination; and Kebalo, the Director of the unit. At the close of its case, Defendant again moved for judgment as a matter of law, arguing that Plaintiff had failed to submit sufficient evidence to establish that Lockheed had retained a similarly situated younger employee and that Plaintiff had failed to establish that Lockheed's justification for firing Plaintiff was pretext.

The Court denied Defendant's motion. The case was submitted to the jury, which found for Plaintiff and awarded him $520,000 in compensatory damages and $520,000 in emotional damages. The jury also found that Lockheed's violation had been willful, triggering an award of $520,000 in liquidated damages under the ADEA. See 29 U.S.C. § 626(b).

After reaching a verdict on liability, the jury heard Plaintiff's case on punitive damages, which consisted of Plaintiff's testimony, in his capacity as a Lockheed shareholder and long-time employee, about the worth of Lockheed. (Tr. 733-

742). Plaintiff initially sought to question in-house counsel for Lockheed, who was present at trial, but relented upon Defendant's objection. (Tr. 720-23). Defendant cross-examined Plaintiff but presented no witnesses of its own. Defendant did not move for judgment as a matter of law at the close of the punitive phase. After a short deliberation, the jury returned a punitive damages award of $50,000,000. Defendant orally moved to remit the jury's award. The Court responded that it would receive the parties' written submissions.

The Court entered Judgment on February 6, 2017. On March 6, 2017, the parties filed the pending motions.

b. <u>Trial</u>

As noted above, the jury found for Plaintiff after a four-day trial. The following constitutes a summary of the evidence presented at trial.[3]

Plaintiff was born on February 27, 1946. He was hired as an engineer by RCA, a predecessor to Lockheed, in December, 1984, and remained employed with the company, through a series of mergers, until 2012 when he was terminated as part of a Reduction-in-Force ("RIF"), a mass layoff by the company. Plaintiff was 66 years old at the time of his termination, and

---

[3] As the parties are fully familiar with the record, the Court summarizes the testimony only.

he maintains that he was selected for the RIF because of his age.

> i. *Plaintiff's Positions at Lockheed; Corporate Structure*

Plaintiff served in a number of positions in his 28 years at Lockheed. In 2010, he was moved for the final time from the "New Ventures" program to the Hardware Engineering Organization ("Hardware Engineering") within the Mission Systems and Sensors ("MS2") business unit. At the time of his termination, Plaintiff was serving as a Project Specialist, Senior Staff ("PSSS") and working largely on "Anti-Tamper" technology.[4] Employees designated as PSSS were engineers with significant technical experience, but did not typically have other employees reporting directly to them. Plaintiff was part of a group of employees who reported directly to Christopher Renna, a staff manager in the MS2 unit. The other PSSS employees in Plaintiff's group were James Reynolds and Kim Tighe who were 47 and 34 years old, respectively, at the time of the RIF. Neither Reynolds nor Tighe was terminated.

---

[4] "Anti-Tamper" refers to hardware installed in electronics and computers to protect them from "hacking and intrusion for reverse engineering or stealing secret information." (Tr. 182:12-15).

Renna, in turn, reported to Christopher Kebalo, the Director of Hardware Engineering. Kebalo's direct superior was Jay Hansen. Hardware Engineering fell within the ambit of "Tech Ops," and the Vice President in charge of "Tech Ops" for MS2 was Norm Malnak.

> ii. *Performance Evaluations*

During Plaintiff's time at Lockheed the company undertook a yearly formal evaluation process for its employees. Throughout the year, individuals who worked closely with or who had first-hand knowledge of the employee's performance, known as "multi-raters," could provide written feedback through Lockheed's automated performance review system. In Plaintiff's case, these individuals were typically project managers and other employees working with Plaintiff on projects to which he was assigned.

At the end of each evaluation period, a manager would generate an overall score for an employee, taking multi-rater feedback into account. As noted, at the time Plaintiff was selected for the RIF, his manager was Christopher Renna. The manager would bring this preliminary numeric rating to a "rating and ranking session" with other managers to discuss the rankings for all of the employees in a given group. The outcome of this process was an overall rating from 1 to 5 (best to worst) for each person. These ratings were subject to a required

distribution put in place by Lockheed so that the employees could be ranked against one another. Occasionally, to meet these rating distribution targets, some employees' scores would be lowered. Managers had discretion regarding the information ultimately documented in the final written review as well as the employee's final rating and ranking.

In 2010 and 2011 -- the two years preceding his termination -- Plaintiff was rated as a "Basic Contributor," the second lowest possible score. (Pl. Tr. Ex. "PTX"-4, 6). At trial, Plaintiff testified that these reviews and the review process were manipulated by Lockheed as a way to push him out. Plaintiff testified, in essence, that from as early as 2001, his scores were artificially lowered to the point that they were inconsistent with his multi-rater feedback. (See PTX-5, 7). He also testified and presented evidence that in his later years at the company, the younger employees in his group, particularly Reynolds (age 47 at the time of Plaintiff's termination), received scores that were artificially high when compared to their multi-rater feedback.

Plaintiff testified that around 2002, the first time he received a score that he felt was unfairly low, he approached his manager, Judd, who told him that Hansen, Judd's supervisor, had stated "Rob's been there too long, it's time to get rid of

him." Both Judd and Hansen testified at trial, and both denied
that this statement was ever made. Although Plaintiff testified
that Hansen was not his supervisor at the time of the RIF and
that he was not aware if Hansen played any role in the decision
to include him in the RIF, he also testified that the rankings
from one year would be used as a "starting point" for future
rankings. (Tr. 162:1-3).

At trial, Defendant contested both the fact of Plaintiff's
reviews being contrived and whether the reviews were the basis
of his termination. Defendant presented testimony through both
Renna and Kebalo that the RIF was an age-neutral process taken
as a measure to curb rising costs to customers. Both Renna and
Kebalo also testified that Plaintiff was selected for the RIF
due to "workload softness" -- a current and projected lack of
work. Defendant also presented testimony through Renna that
Plaintiff was "difficult" to work with, leading to bad reviews
and contributing, at least in part, to his lack of work. As
proof that Plaintiff was experiencing "workload softness,"
Defendant presented an email sent from Renna to Kebalo in July
2011, warning that Plaintiff would be going "idle" part-time
because some of the projects on which he was working were "being
stopped for the near future." (Def. Tr. Ex. "DTX"-39).

     iii. *Lockheed's Documentation*

Plaintiff relied heavily at trial on documentary evidence, specifically a Power Point presentation titled "MS2 Workforce Reduction Analyses and Recommendation" (the "RIF Analysis"). (PTX-19). The RIF Analysis was prepared by Lockheed[5] in February 2012 and contained a series of slides summarizing the reasons for the RIF and the methodology to be used in carrying it out. The title slide listed the names of eleven high level Lockheed employees, including Norm Malnak.

The RIF Analysis set forth the "Business Case for [the] 2012 MS2 Reduction." (See PTX-19 at 1074). According to this analysis, MS2 had become "top heavy" with too many upper-level employees and a "shrinking talent pipeline." (Id. at 1086). This called for MS2 to "Do 8.4% (479) Upper Level Exempt Reductions and Hire 185 Entry Levels." (Id. at 1074)(emphasis in original). The stated purpose of this reduction of upper level employees and influx of entry levels was "Aligning [the] Engineering Workforce to Future Customer Affordability, With [the] Right Skills." (Id.)(emphasis in original). Lockheed referred to the end result of this process as a "re-energized" entry level pipeline. (Id. at 1079). Multiple witnesses testified at trial that this "pipeline" tended to refer to younger employees.

---

[5] There was no evidence presented at trial as to who exactly it was that prepared this presentation.

iv. *Voluntary Layoff Program*

The RIF consisted of two stages, which Lockheed announced simultaneously. First, there was a "Voluntary Layoff Incentive Program" ("VLIP") through which employees could voluntarily leave the company and receive a payout. There was no age requirement for the VLIP, but according to the RIF, only employees at "Level 3" -- non "entry-level" -- and above were eligible. The VLIP served as "risk mitigation for involuntary selection adverse impact." (PTX-19 at 1075). In connection with the VLIP, Lockheed prepared, among other things, three charts analyzing "employees with a high probability of accepting VLIP" and an analysis of a previous RIF. (Id. at 1075, 755). Each of the three charts divided employees into groups based on age and years of service with the company. Only employees who were at least 50 years old and had at least 15 years of service were included in these charts. (Id. at 1081-83). These charts further highlighted those employees who were at least 60 years old and had been with the company for at least 15 years. (Id.)

Defendant presented testimony through Kebalo that these charts were not evidence of Lockheed targeting older employees, but were merely an assessment of those most likely to volunteer. This analysis was necessary, according to Kebalo, because the company had to prepare itself for the loss of experienced

employees that this layoff would inevitably bring about. In fact, Kebalo testified, the company did not desire such a result, but considered it a threat. To further support its position that the VLIP was not aimed at older employees, Defendant presented the testimony of Gillespie -- who had accepted a voluntary layoff -- that employees interested in participating in the VLIP had to apply, and that some employees who applied for the VLIP were rejected. (Tr. at 384-85).

v. *Involuntary Layoffs/Communities of Interest*

At the conclusion of the VLIP, there was an <u>involuntary</u> layoff during which certain employees who had not volunteered were selected for termination. Lockheed prepared a schedule for the involuntary portion of the RIF that called for management to take several steps before selecting employees for involuntary termination. (<u>See</u> PTX-19 at 1076). The step most critical to this case was the one that required Lockheed to create "Communities of Interest" ("COI"), which were groupings of employees based on their skills and the type of work they were doing. COIs were further divided by employee "level," which is based on position and years of service, among other things. Once these COIs were created and employees were placed into them, managers and directors were to identify which COIs would be affected by the RIF, create a list of "critical skills" for each

COI, rank the employees in each COI, and finally select those to be laid off. (Id.)

The undisputed evidence at trial was that Lockheed, and specifically Renna, placed Plaintiff in a COI of one. (Tr. 125:21-25). He was placed in the "Digital Design" COI, and was the only Level 5 employee placed in that group. This COI was eliminated. Because Renna place Plaintiff into a COI of one, the RIF's further directives, such as ranking, became moot. In other words, no one at Lockheed ever created a list of "critical skills" for Plaintiff in connection with the RIF, nor did anyone -- or was it possible to -- rank him within his COI. Lockheed attempted to justify its placement of Plaintiff into a COI of one by presenting evidence through Kebalo and Renna that Plaintiff was the only employee in MS2 doing the type of work he was doing. They testified that it was not necessary to further determine Plaintiff's "critical skills" because his entire COI was subject to "workload softness" and needed to be eliminated. Plaintiff, however, disputed this testimony. He testified that "Digital Design" did not accurately reflect his skillset or the work he was doing. As noted, Plaintiff was transferred into Renna's group in 2010, and Renna testified that he had never made an effort to learn what skills Plaintiff had developed up to that point. Renna testified that he "never had a meeting to

probe [Plaintiff's] skills [sic] sets," and that he never had a
"conversation" with anyone who had previously worked with
Plaintiff to determine what Plaintiff was good at. (Id. at
492:4-11).

## II.  Judgment as a Matter of Law

### a. Legal Standard

A motion for judgment as a matter of law may be granted
where "a party has been fully heard on an issue during a jury
trial and the court finds that a reasonable jury would not have
a legally sufficient evidentiary basis to find for the party on
that issue." Fed. R. Civ. P. 50(a)(1). If the Court denies a
motion for judgment as a matter of law raised during trial, the
moving party may renew that motion post-trial under Fed. R. Civ.
P. 50(b). In order to preserve the right to renew a motion for
judgment as a matter of law, the moving party must raise a Rule
50(a) motion with "sufficient specificity to put the [nonmovant]
on notice" before the case is submitted to the jury. Williams v.
Runyon, 130 F.3d 568, 571-72 (3d Cir. 1997).

A Rule 50 motion "should only be granted if 'the record is
critically deficient of that minimum quantity of evidence from
which a jury might reasonably afford relief." Raiczyk v. Ocean
County Veterinary Hospital, 377 F.3d 266, 269 (3d Cir.
2004)(citing Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d

243, 249 (3d Cir. 2001)). "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict." Johnson v. Campbell, 332 F.3d 199, 204 (3d Cir. 2003)(emphasis in original) (citation and internal quotation marks omitted).

"In making this determination, 'the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version.'" TransWeb, LLC v. 3M Innovative Properties Co., 16 F. Supp. 3d 385, 391–92 (D.N.J. 2014) (quoting Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993), aff'd, 812 F.3d 1295 (Fed. Cir. 2016)). The Court must "disregard all evidence favorable to the moving party that the jury is not required to believe . . . [t]hat is . . . give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000)(citation and internal quotation marks omitted).

### b. Liability under the ADEA and the NJLAD

Defendant argues that it is entitled to judgment as a matter of law because (1) Plaintiff failed to establish a prima

facie case of age discrimination under the ADEA or the NJLAD;[6]

(2) even if Plaintiff had established a prima facie case,

---

[6] Plaintiff argues that on a motion for judgment as a matter of law it is improper for the Court to consider the argument that a plaintiff failed to establish an element of its prima facie case. Instead, Plaintiff argues, the Court should simply focus on the "ultimate question," _i.e._, whether Defendant intentionally discriminated against Plaintiff. To this end, Plaintiff contends that the issue at this stage is "whether there was evidence, direct or circumstantial, which when viewed cumulatively was sufficient for the jury to either disbelieve Defendant's articulated reason(s) or believe that an invidious discriminatory reason was more likely than not a determinative cause of the employer's action." (Pl.'s Br. at 3).

While Plaintiff may be correct that this Court's duty at this stage is not to evaluate the prima facie case, see U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983), elements of the prima facie case are often subsumed into the ultimate determination of discrimination. See Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 301 n. 13 (3d Cir. 2007) ("any difference in our analysis at this stage is probably more semantic than substantive."). In fact, the jury in this case was instructed that "[t]o prevail . . . Mr. Braden must prove . . . [that] at the time of the layoff Lockheed Martin Corporation retained a similarly situated substantially younger employee." (Tr. 701:19-23).

Whether framed as an element of the prima facie case or indirect evidence of discrimination more generally, if Plaintiff did not establish that either Reynolds or Tighe were similarly situated to him, he could likely not have established that Defendant discriminated against him based on his age. Plaintiff tried his case based on circumstantial evidence of discriminatory intent, and younger employees being retained while he was let go is a significant part of that theory. Therefore, the Court will proceed to analyze whether Plaintiff set forth sufficient evidence to establish the fourth element of the prima facie case. See Bruno v. W.B. Saunders Co., 882 F.2d 760, 764 n. 2 ("[a]lthough we do not address this contention in terms of the prima facie case, it may be that our inquiry into the sufficiency of the evidence to support . . . an inference [of discrimination] will not differ markedly from an inquiry

Defendant offered a legitimate, non-discriminatory reason for his termination; and (3) Plantiff failed to establish that Defendant's proffered non-discriminatory explanation was pretextual.

Plaintiff relied on circumstantial evidence to establish his age discrimination claims. Age discrimination claims based on circumstantial evidence under both the ADEA and the NJLAD are evaluated under the McDonell Douglas burden shifting framework. Anderson v. Consol. Rail Corp., 297 F.3d 242, 249 (3d Cir. 2002)(citation omitted); Bergen Comm. Bank v. Sisler, 157 N.J. 188, 200 (1999). First, to raise the inference of discrimination, a plaintiff must establish a prima facie case by showing that he or she was a member of a protected class who was qualified for the position at issue and suffered an adverse employment action. Anderson, 297 F.3d at 249 (citing Showalter v. University of Pittsburgh Med. Ctr., 190 F.3d 231, 234-35 (3d Cir. 1999); Connors v. Chrysler Financial Group, 160 F.3d at 973-74). Additionally, in the context of an RIF, a plaintiff must establish that the employer retained a "sufficiently younger" employee who was "similarly situated" to the plaintiff.

_____

into whether the plaintiff has introduced evidence sufficient to establish one of the elements essential to [his] prima facie case.") (citation omitted).

Anderson, 297 F.3d at 249; Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305 (3d Cir. 2004).

To rebut the inference of discrimination created by the prima facie case, the defendant must "offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge." Showalter, 190 F.3d at 235 (citations omitted). If the defendant satisfies this burden, then the plaintiff must establish that the reasons offered by Defendant are pretextual, and that the actual reason for the adverse employment action was age discrimination. Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

The Court will focus its analysis on whether the evidence was sufficient for a reasonable jury to find that: Defendant retained a similarly situated younger employee when it terminated Plaintiff; Defendant offered a legitimate non-discriminatory reason for terminating Plaintiff; and Plaintiff established that Defendant's proferred reason was pretextual.

> i. *Whether Reynolds or Tighe were "Similarly Situated" to Plaintiff*

Under both the ADEA and the NJLAD, in order to raise the rebuttable inference of discrimination in an RIF age discrimination case, a plaintiff must show that an employer

retained a similarly situated employee who was sufficiently younger than the plaintiff. <u>Monaco</u>, 359 F.3d at 305.[7] This requirement exists because these are not "bumping statute[s] . . . guaranteeing a protected employee a job at the expense of a sufficiently younger employee." <u>Anderson</u>, 297 F.3d at 250.

The Court in <u>Monaco</u> set forth the analysis used in this Circuit to determine if two employees are similarly situated:

> [A]n individual does not need to be situated identically to satisfy the fourth element of a plaintiff's prima facie case . . . . In order to determine who might qualify as a similarly situated employee we must look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner.

<u>Id.</u> (citation omitted).

This fact-intensive inquiry is "based on a whole constellation of factors facing [an] individual employee." <u>Id.</u> at 306. The jury was instructed as much. The Court charged them that

> [i]n determining whether a similarly situated, substantially younger employee was retained, the fact that the employee may hold the same joint title does

---

[7] Plaintiff was 66 years old at the time he was selected for the RIF. Reynolds and Tighe, who were retained and whom Plaintiff contends were similarly situated, were 47 and 34, respectively. (TR.157:18-24). There is no dispute that these employees were sufficiently younger than Plaintiff. Therefore, the Court focuses on whether they were similarly situated.

> not necessarily mean that they are similarly situated.
> That is for you to decide. You may consider factors
> such as the employee's job title, job functions, level
> of supervisory authority, salary, and any other
> factors you deem relevant.

(Tr. 701:23-702:5).

At trial, Plaintiff elicited testimony and submitted documentary evidence regarding Reynolds and Tighe. Defendant contended at trial and maintains in its current motion that neither of these employees was similarly situated to Plaintiff. Because there was substantially more evidence presented regarding Reynolds, the Court will concentrate on whether Plaintiff and Reynolds were similarly situated.

Plaintiff presented evidence of several commonalities between himself and Reynolds. At the time of the RIF, Plaintiff and Reynolds were both serving in the PSSS position in the "Tech Ops" unit of MS2 and were both "Level 5" employees with the same job code, job description, and who reported directly to Christopher Renna. (Tr. at 101:6-9; 151:14-23; 152:25-153:3; 157:6-13; 393:23-394:16; 395:18-23; PTX-3). Further, Plaintiff testified that he and Reynolds performed the same basic job duties, including serving as "technical leaders" on projects involving equipment engineering work. (Tr. at 159:1-6; 193:18-20; PTX-7 at 1425). Moreover, Renna testified that Level 5 employees tend to be versatile and qualified to do many

23

different things. (Tr. at 399:14-17). Finally, Plaintiff and Renna both testified that when Renna conducted performance reviews and ranked and rated employees, he compared Reynolds and Plaintiff against one another. (Id. at 497:19-25).

Defendant argues that Reynolds and Plaintiff were not similarly situated because they had different job functions, levels of supervisory responsibility, and salary, three factors relevant to the jury's consideration under Monaco. Specifically, Defendant points to the testimony of Renna that Reynolds was working as the "test and evaluation lead" on the "most important program" in the Hardware Engineering Organization, (Id. at 433; 435:7-11), on which he had ten to fifteen engineers reporting to him, (Id. at 434:17-435:3), and managed a large budget, (Id.) Defendant compares this to Renna's testimony that Plaintiff worked mainly as an "individual contributor" (Id. at 427-28), working on smaller projects with less responsibility, and was paid a lower salary. (Id.) Additionally, Defendant points to multi-rater feedback referring to Reynolds as "management" on a project and Plaintiff as "support" on another. (PTX-5, 10). Plaintiff, however, presented multi-rater feedback from multiple sources referring to him as a "technical leader," and testified that he oversaw other employees on various projects. (Tr. 111-114, 152:10-15; PTX-5, 7, 8).

As set forth above, it is not the Court's role to weigh
this competing evidence, make credibility determinations, or
substitute its judgment for that of the jury. Rather, the
question at this stage is whether there was a "legally
sufficient evidentiary basis to find for the [Plaintiff] . . .
." Fed. R. Civ. P. 50(a)(1). The jury was presented with
evidence from both sides and weighed all factors it considered
relevant, as it was instructed to do. It could have reasonably
decided, in light of the similarities between Plaintiff and
Reynolds and considering how work was assigned on a project by
project basis, that Plaintiff and Reynolds were similarly
situated despite the fact that they were working on different
projects at the time of the RIF. (See Tr. at 103-104) (PSSS were
assigned to various projects and programs). The Court will not
disturb the jury's finding on this issue.

### ii. *Defendant's Proffered Legitimate Business Reason*

Because Plaintiff established his prima facie case,
Defendant had the burden to offer any non-discriminatory reason
why Plaintiff was selected for the RIF. Defendant's burden was
one of production, not proof, and could be met by "introducing
evidence which, taken as true, would permit the conclusion that
there was a nondiscriminatory reason for the unfavorable

employment decision." <u>Bleistine v. Diocese of Trenton</u>, 914 F.
Supp. 2d 628, 639 (D.N.J. 2012). Defendant offered a legitimate
non-age reason for Plaintiff's termination: "workload softness."
(Tr. 528:13-25).

Defendant offered evidence that Plaintiff was let go
because the type of work on which he was spending the bulk of
his time, "Anti-Tamper," was not in high demand and it was
difficult to keep Plaintiff working full-time on client-
projects. (<u>Id.</u> 403:10-405:1). According to Kebalo and Renna,
Defendant's fear was that a lack of work would lead to portions
of Plaintiff's salary being charged to clients as overhead,
thereby decreasing profits. (<u>Id.</u> 516:5-7, 529:1-531:21).

       iii. *Plaintiff's Showing of Pretext*

Plaintiff's ultimate burden in this case was to establish
that "but for" his age, he would not have been terminated. <u>Gross
v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 177-78 (2009). To meet
this burden at trial, Plaintiff was required to convince the
jury "<u>both</u> that the [Defendant's legitimate] reason was
false, <u>and</u> that discrimination was the real reason [for
Plaintiff's termination]." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764
(3d Cir. 1994) (emphasis in original)(citing <u>St. Mary's Honor
Ctr. v. Hicks</u>, 509 U.S. 502, 515 (1993)). Plaintiff could make
this showing by establishing the elements of his prima facie

case and providing to the jury evidence from which it could either "(1) disbelieve [Defendant]'s articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764 (citations omitted).

To establish pretext as described above, Plaintiff could

demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendant]'s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons" . . . [or] come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons).

<u>Id.</u> at 765 (citations omitted). Plaintiff took both of these approaches at trial.

First, there was evidence in the record upon which the jury reasonably could have discredited or disbelieved Lockheed's "workload softness" justification both generally, and as it applied to Plaintiff. First, Plaintiff testified that he had a

27

"full plate" of work in the year before the RIF and was working fifty to sixty hours per week on several projects, some of which were funded for the rest of 2012 and beyond. (Tr. 178:1-24; 188:12-189:4; PTX-14). To refute this testimony, Defendant presented the testimony of Kebalo and Renna to establish that they did not have enough work to keep Plaintiff fully employed. In support of this testimony, Lockheed offered an email sent from Renna to Kebalo in 2011 warning that some of the projects on which he was working were "being stopped for the near future." (DTX-39). Other than this generalized testimony, Defendant did not offer any other meaningful documents, however, purporting to establish that "workload softness" was an actual concern or providing any concrete examples of work shortages.

Second, Plaintiff demonstrated the inconsistent testimony of Gillespie, Kebalo, and Renna regarding why and how Plaintiff was selected for the RIF. When pressed, each testified variably that past performance ratings either did or did not lead to Plaintiff's selection. (Id. at 121-122 (Gillespie testifying that performance "may have" played a role in Plaintiff's selection but that he did not believe it did); 272:14-16 (Kebalo testifying that ratings did not play a role); 514:8-12 (Renna testifying that ratings did play a role)).

Further, the testimony of Defendant's witnesses presented conflicting conclusions: was Plaintiff selected for the RIF because he was "struggling to stay employed" due to performance and personality issues, (Id. at 459:16-23), was Plaintiff truly placed into in a COI based on his skill set, which happened to be chosen for elimination, or was Plaintiff placed in a COI of his own simply for the purpose of eliminating him? As Plaintiff's manager, Renna was responsible for selecting Plaintiff for the RIF. When asked why Plaintiff was selected for the RIF, Renna testified that "Mr. Braden was, you know, fairly routinely struggling to stay fully employed so that made him an obvious consideration." (Id.) Plaintiff, however, contradicted this testimony and, hence, a jury could easily have concluded that Lockheed selected Plaintiff for termination and then placed into a COI of his own to justify its decision. Renna testified that at the time employees were placed into COIs, the decision had not yet been made which COIs would be eliminated. (Id. at 462:25-463:3). A jury, of course, was free to disbelieve such testimony as well, and it apparently did.

When asked who made the decision to eliminate Plaintiff's COI, Renna testified that "once [he] made the decision that Mr. Braden would be on the candidate list for the RIF," he "looked at it and said, well, if there are no others, this could be a

candidate for job elimination." (Id. at 463:14-22). Again, the
jury was free to conclude that Plaintiff was selected for layoff
because of his age and Lockheed's placing him into a COI of one
was merely a charade. Plaintiff was the only employee chosen for
his COI – "digital design." Placement into a COI was a process
"strictly based on [an employee's] demonstrated skills." (Tr.
522:22-25). Plaintiff testified that "digital design" did not
accurately reflect his skill set or the type of work he was
doing in 2010-11. (Id. 190:4-15). Renna testified otherwise.
(Id. at 424:3-11). Plaintiff was new to both Renna's group and
to "Anti-Tamper" work. Renna testified that he was not aware of
the work Plaintiff did before joining the group in 2010, nor did
he ever engage in any effort to determine what skills Plaintiff
possessed. (Id. 486:22-25; 491:14-492:11). Again, the jury was
free to believe Plaintiff and not Renna, and it apparently
agreed with Plaintiff that Lockheed put him into a COI of his
own based on discriminatory motives.

There was also evidence introduced at trial that supported
the jury's finding that age discrimination was the real reason
for Plaintiff's termination. Such evidence included the RIF
Analysis prepared by Lockheed. (See PTX-19). This "blueprint,"
as Plaintiff refers to it, included the conclusion that the MS2
unit was "top heavy" and a recommendation that Defendant

decrease the number of upper level employees while simultaneously hiring at the entry level with an eye towards filling the "shrinking talent pipeline" and ensuring "<u>future</u> customer affordability." (<u>Id.</u> at 1074-75, 1086) (emphasis in original). This document referred to the forecasted result of this process as a "re-energized" pipeline. (<u>Id.</u> at 1079). Plantiff elicited testimony from Gillespie that "entry level" tends to refer to younger employees while "upper level" employees tend to be older. (Tr. 83:19-84:1; 86:3-7).

Plaintiff argues that this evidence is bolstered when considered together with the VLIP. The voluntary first phase of the RIF was limited to employees at Level 3 and above (PTX-19 at 1075), was announced simultaneously with the involuntary layoffs (<u>Id.</u>), and, based on charts included in the RIF Analysis, either targeted employees ages 50 and older or was undertaken with the knowledge that those employees were the most likely to accept a voluntary discharge. (<u>Id.</u> at 1081-82).

Additionally, Plaintiff presented evidence that he had been receiving unfairly low scores on his reviews in light of his positive multi-rater feedback. (<u>See</u> PTX 4, 5, 7). Renna attempted to explain this away, stating that written multi-rater feedback tends to be more positive because multi-raters are hesitant to write negative comments about their co-workers. He

testified that negative comments are often communicated to him outside of the formal multi-rater process. Plaintiff contrasted this with Reynolds, who received seemingly negative multi-rater feedback from the program manager on his largest project, but was consistently rated higher than Plaintiff. (See PTX-9, 10).

Plaintiff also testified to his experience in "ranking and rating" sessions in the period prior to 2008. (Tr. 166-67). He testified that when managers were considering rankings, age was taken into consideration, although not in explicit terms. According to Plaintiff, he heard managers make comments such as "well he's been here a long time" so "he's not going to go anywhere" or "object" to a lower rating. (Id. at 166:21-24). These comments apparently reflected managers' recognition of the fact that older workers were less "marketable," another term that Plaintiff claims was used in these sessions. (Id. at 167:5-6).

Finally, Plaintiff testified about the age-discriminatory comment allegedly made by Hansen to Judd in the early 2000s.[8] Plaintiff testified that the first time he received a score that he believed was unreasonably low, he complained to his manager, Judd. He testified that in response to his complaint, Judd told

---

[8] This statement was admitted over objection and its admissibility is discussed below.

him that Hansen had asked him to lower Plaintiff's score because Hansen was concerned that if Plaintiff's scores were not lowered, they would never be able to "get rid of him." As noted above, both Hansen and Judd testified at trial and both denied that any such comment was ever made. (Tr. 350-51; 366:21-24). Judd testified that he and Hansen did have a conversation about putting Plaintiff on a "Performance Improvement Plan" and that in the context of that conversation, Hansen stated that Plaintiff's poor performance had been "going on too long" and needed to be addressed. (Id. at 352:2-4). Plaintiff testified that this was the first time his score was lowered for improper purposes, and testified that managers use previous ratings as a "starting point" for future ratings. (Tr. 162:1-3). The jury was free to disbelieve Judd and Hansen as to this issue.

Defendant makes two additional arguments to counter the above analysis, both of which this Court rejects, as there was sufficient evidence by which a jury could find age based discrimination. First, Defendant argues that the RIF Analysis actually militates against a finding that age was behind the RIF or Plaintiff's selection for it because on its face, the RIF Analysis is focused on cost reduction and customer affordability, not age, and nothing stated therein is inconsistent with that justification. To bolster this argument,

Defendant points to the Older Workers Benefit Protection Act
Adverse Impact Analysis ("Adverse Impact Analysis"), a document
prepared by Lockheed that lists the job title and age of all MS2
employees and indicates who was selected for the RIF. (See PTX-2
at 114-16). This document shows that (1) at least three
employees older than Plaintiff and with his same job title were
not selected for the RIF and (2) of the ten employees with
Plaintiff's job title who were 60 or older, only Plaintiff was
selected for termination. Plaintiff interprets the Adverse
Impact Analysis differently, and at trial elicited testimony
from Gillespie that all of the five employees with Plaintiff's
job title who were terminated via the RIF were at least 50 years
old. (Id.) Second, Defendant argues both that it offered a
consistent reason for Plaintiff's termination at trial, and that
any statement made by Hansen in 2002 was completely irrelevant
and unrelated to that explanation.

Defendant's case rested largely on the testimony of four of
its own employees. The only documentation of Plaintiff's
"workload softness" was one email. Therefore, the question of
pretext and, thereby, liability, turned in large part on the
credibility of Defendant's witnesses, "an issue squarely within
the province of the [jury]." Tumolo v. Triangle Pac. Corp., 49
F. Supp. 2d 798, 800 (E.D. Pa. 1999), aff'd, 225 F.3d 650 (3d

Cir. 2000). As this Court already noted, the jurors evaluated each witness's credibility and demeanor, as they were supposed to, and decided which testimony to credit accordingly. Clearly, the jury did not believe Defendant's witnesses when they testified that "workload softness" was the reason for Plaintiff's termination. Defendant has not established that the jury was not free to make such a choice. In addition, viewing all the evidence outlined above -- particularly the RIF and VLIP Analyses, Plaintiff's placement into a COI of one, and the evidence of contrived ratings -- in the light most favorable to the Plaintiff, and giving him the benefit of every fair and reasonable inference as this Court is required to do on a Rule 50 motion, it was not unreasonable for the jury to find that age discrimination was the real reason. <u>Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.</u>, 530 F.3d 204, 209 (3d Cir. 2008).

### c. <u>Punitive Damages</u>

Defendant also seeks judgment as a matter of law on the jury's award of punitive damages, arguing that the evidence at trial did not warrant any such award. As discussed above, however, Fed. R. Civ. P. 50(b) provides for a renewed motion. The right to file a renewed motion pursuant to Fed. R. Civ. P. 50(b) must be preserved by first moving under Fed. Rule. Civ. P. 50(a) at trial, specifying the "judgment sought and the law and

facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2).

In order to preserve such right, the moving party must have raised an issue "with sufficient specificity [at trial] to put the [nonmovant] on notice" of the insufficiencies in its case and afford it "an opportunity to cure" such defects. Runyon, 130 F.3d at 571-72; Lightning Lube, 4 F.3d at 1173 (citing Acosta v. Honda Motor Co., 717 F.2d 828, 831–32 (3d Cir. 1983)). To determine whether an issue has been raised, the Court must "look to the 'the communicative content, specificity and notice-giving function of an assertion . . . judged in context.'" Holt v. Pennsylvania, 683 F. Appx. 151, 156 (3d Cir. 2017)(quoting Acosta, 717 F.2d at 832(internal quotation marks omitted)). "Absent a motion in accordance with . . . Rule . . . 50(a), judicial reexamination of the evidence abridges [a party's] right to a trial by jury." Lightning Lube, 4 F.3d at 1173 (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 183 (3d Cir. 1992)).

Defendant moved for judgment as a matter of law twice at trial: at the close of Plaintiff's case-in-chief and again at the close of its case. Both times, Defendant argued that Plaintiff did not submit sufficient evidence to establish his prima facie case or to establish that Lockheed's justification

for firing Plaintiff was pretext. At neither point did Defendant
address the sufficiency of Plaintiff's evidence as it related to
the issue of punitive damages.[9] Notably, after the jury returned
its verdict on liability and willfulness, there was a "punitive
phase" to the trial. At this phase Plaintiff, in his capacity as
a Lockheed shareholder and former long-time employee, testified
regarding the company's worth. At the conclusion of Plaintiff's
testimony, Defendant had a third opportunity to move for
judgment as a matter of law on the issue of punitive damages
before the issue was put to the jury, but it did not. As such,
Defendant waived its right to bring a renewed motion for
judgment as a matter of law on punitive damages.[10]

---

[9] As discussed in detail below, to establish entitlement to
punitive damages under the NJLAD, Plaintiff was required to show
(1) actual participation in or willful indifference to by upper
management and (2) that the offending conduct was "especially
egregious." Rendine v. Pantzer, 141 N.J. 292, 314, 661 A.2d
1202, 1215 (1995)(citing Lehmann v. Toys 'R' Us,
Inc., 132 N.J. 587, 626 A.2d 445 (1993)). Plaintiff did not
raise these issues in either of its motions at trial.

[10] Defendant argues that its failure to raise a Rule 50(a) motion
with specificity at trial should be excused pursuant to an
exception to the procedural requirements of Rule 50(b), citing
Fineman v. Armstrong World Indus., Inc., 774 F. Supp. 225, 230
(D.N.J. 1991), rev'd in part, 980 F.2d 171 (3d Cir. 1992). The
exceptions discussed in Fineman, however, appear to have been
created to relax the timing requirements under a previous
version of Rule 50 which required that a party move "at the
close of all evidence," rather than the specificity of such
motion. See Id.; see also, e.g., Jeckell v. Crestwood Area Sch.
Dist., No. 3:04-CV-1135, 2008 WL 4372797, at *3 (M.D. Pa. Sept.
18, 2008) (citing Advisory Committee Notes, following Fed. R.

### III. New Trial

#### a. <u>Legal Standard</u>

Fed. R. Civ. P. 59 provides that a court may, after a jury trial, "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A). Although the language of Rule 59 does not cite specific grounds for a new trial, there are several recognized bases for such a grant. The most commonly raised reasons are that: there was prejudicial error of law, the verdict is against the weight of the evidence, the verdict is too large or too small, there is newly discovered evidence, conduct of counsel or of the court has tainted the verdict, or there has been misconduct affecting the jury. 11 C. Wright, A. Miller & R. Kane, Federal Practice and Procedure § 2805, at 55 (2005); <u>see also</u> <u>Lightning Lube, Inc. v. Witco Corp.</u>, 802 F. Supp. 1180, 1186 (D.N.J. 1992).

The decision to grant a new trial is left to the sound discretion of the trial judge. <u>See</u> <u>Ford v. Cty. of Hudson</u>, No.

---

Civ. P. 50.). These exceptions are irrelevant here not only because they apply to a rule which is no longer in effect, but because the issue before the Court is not the timing of Defendant's motions, but rather the motions' specificity, or lack thereof.

07-5002, 2016 WL 6304436, at *6 (D.N.J. Oct. 25, 2016)(citation omitted); see also Allied Chemical Corp. v. Daifion, Inc., 449 U.S. 33, 36 (1980). A trial court may not, however, grant a new trial simply because it would have come to a different conclusion than that reached by the jury. Lightning Lube, 802 F. Supp. at 1186.

Defendant seeks a new trial on two grounds. First, it argues that the jury's decisions on both liability and punitive damages are contrary to the weight of the evidence. Second, Defendant argues that the Court committed legal error in (1) admitting Plaintiff's testimony regarding Jay Hansen's alleged statements and (2) allowing Plaintiff to testify regarding Lockheed's financial condition during the punitive damages phase of the trial.

> b. Liability

> > i. *Weight of the Evidence*

Defendant argues that the jury's decision that Lockheed had discriminated against Plaintiff because of his age was against the clear weight of the evidence. A trial court should grant a new trial based on the weight of the evidence only when "the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." Marra v. Phila. Hous.

Auth., 497 F.3d 286, 309 n. 18 (3d Cir. 2007) (citing Williamson
v. Consolidated Rail Corp., 926 F.2d 1344, 1353 (3d Cir. 1991)).
Specifically, Defendant argues that the objective evidence
clearly established that Reynolds and Plaintiff were not
similarly situated, and that the weight of the evidence at trial
demonstrated that "workload softness" was the true reason for
the RIF.

With regard to Reynolds, the evidence presented on the
issue of his similarity to Plaintiff -- a "fact-intensive"
inquiry for the jury -- is discussed above and will only be
summarized here. Evidence of similarity included testimony and
documents setting forth that Reynolds and Plaintiff: had the
same job title, job code, and job description; reported to the
same manager, Renna; were engineers with diverse skillsets
serving as "technical leaders" in a position where the work
varied on a project by project basis; and were ranked against
one another by Renna. Defendant argues that this evidence is
outweighed by Renna's testimony that Reynolds was working on a
much larger project than Plaintiff at the time of the RIF and
multi-rater comments referring to Reynolds as a "manager" and
Plaintiff as a "contributor" on different projects. While it may
have been a close question, based on this evidence, the jury's
decision that the two were similarly situated does not shock

this Court's conscience and allowing its decision on this issue to stand will not result in a miscarriage of justice.

Defendant also argues that the weight of the evidence was against Plaintiff on the issue of pretext. Defendant argues that "Plaintiff did not present any objective evidence at trial that age was a factor" in Lockheed's selection of Plaintiff for the RIF. To the extent Defendant faults Plaintiff for failing to introduce direct evidence of discrimination, its argument is misguided. Because he pursued a case based on circumstantial evidence, Plaintiff was not required to do so. Reeves, 530 U.S. at 148 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.") Both parties' evidence, and Defendant's argument, on the issue of pretext are analyzed in detail above. Plaintiff presented sufficient evidence which could allow the jury to disbelieve Defendant's "workload softness" justification. The trial record does not so favor Defendant that a new trial is warranted.

ii. *Admission of Jay Hansen's Comment*

Defendant argues that the admission of Plaintiff's testimony regarding Hansen's alleged "get rid of him" comment was an error that necessitates a new trial. In order for an

error of law -- including the decision to admit testimony over objection -- to warrant the grant of a new trial, such error must be substantial and must be so prejudicial that a refusal to grant a new trial would be "inconsistent with substantial justice." Hayes v. Cha, 338 F. Supp. 2d 470, 502 (D.N.J. 2004) (citing Fed. R. Civ. P. 61). Defendant contends, as it did in its motion in limine, that Hansen's alleged comment should have been excluded pursuant to Fed. R. Evid. 401 and 403 because it was irrelevant, highly prejudicial, and would mislead the jury.

Evidence is relevant so long as it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." United States v. Sriyuth, 98 F.3d 739, 745 (3d Cir. 1996) (quoting Fed. R. Evid. 401). Defendant argues that Hansen's comment is irrelevant because it was temporally disconnected to the RIF and thus bore no "substantial nexus" with the decision to terminate Plaintiff. See, e.g., Ryan v. CBS Corp., No. 06-2385, 2007 WL 2317380, *7 (E.D. PA. Aug. 7, 2007); Logan v. Countrywide Home Loans, No. 04-5947, 2007 WL 879010, *5 (E.D. Pa. Mar. 15, 2007). Plaintiff's case was built on circumstantial evidence. "[D]iscriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be

used to build a circumstantial case of discrimination." <u>Abrams</u>
<u>v. Lightolier, Inc.</u>, 50 F.3d at 1214 (citation omitted). In
denying Defendant's motion in limine, the Court held that
despite the length of time between Hansen's statement and
Plaintiff's termination, the statement was relevant and the jury
could determine what weight to attribute to it.

Plaintiff's case was largely based on evidence that the RIF
was age discriminatory both in its inception and its application
to Plaintiff. Hansen was a Director in Plaintiff's organization
who played a role in implementing the RIF. Specifically, Kebalo
testified that Hansen took part in the design of COIs, the
mechanism through which Plaintiff was terminated. Plaintiff was
placed into a COI by himself and his COI was eliminated.
Plaintiff presented evidence to the effect that his placement
into this COI was actually a pretext for age discrimination.
Whether Hansen, who oversaw the design of such COIS, harbored an
age-based animus toward Plaintiff was probative on this issue.

Further, Plaintiff testified that Hansen's comment was made
in the context of a performance review. Specifically, Plaintiff
testified that he questioned Judd about a lower than expected
review and Judd told him that Hansen had directed him to lower
the review because Plaintiff had "been there too long."
Plaintiff testified that this was the first time he had received

an unrealistically bad review, and that each year's review served as a starting point for the next year. As discussed above, the jury could have believed that performance reviews played at least some role in Plaintiff's termination. If this first "contrived review" served to lock Plaintiff into a lower rating category from which he could not extricate himself, then it -- and the reason for it -- is relevant to his termination despite the fact that it was made ten years before the RIF. In other words, the jury was free to believe that the comment set the chain of discriminatory events into motion, gradually resulting in a discriminatory act.

Defendant also contends that Plaintiff's testimony regarding the comment should have been excluded pursuant to Fed. R. Evid. 403 because its probative value was "easily" outweighed by the danger of undue prejudice. Defendant argues that this testimony was designed to "trick" the jury into deciding the case on an improper basis. Defendant is mistaken. This testimony was not the sole evidence presented by Plaintiff that could establish that "workload softness" was a pretextual justification for Plaintiff's termination. Plaintiff presented evidence, among other things, that the RIF was facially age-based, that he was not subject to the usual COI process, and that his reviews were unfairly low while Reynolds, a younger

comparator, received scores that were higher than they should

have been. Moreover, Hansen and Judd both testified at trial,

each denying that Hansen had ever made this comment. The jury

was presented with the opportunity to evaluate the credibility

of all three witnesses, and to assign weight to their testimony

accordingly.

In the end, the admission of Plaintiff's testimony

regarding Hansen was not substantial error. Moreover, the

testimony did not prejudice Defendant such that refusal to grant

a new trial is inconsistent with substantial justice. A new

trial is not warranted on this ground.

### c. Punitive Damages under the NJLAD

Defendant argues that it is entitled to a new trial because

the jury's verdict on punitive damages was against the weight of

the evidence and the admission of Plaintiff's testimony at the

punitive phase of the trial was legal error.

#### i. *Weight of the Evidence*[11]

---

[11] Plaintiff contends that Defendant is foreclosed from moving
for a new trial on this ground, arguing that this is simply
another attempt to challenge the sufficiency of the evidence,
which Defendant may not do. Plaintiff cites Yohannon v. Keene
Corp. as support for the proposition that failure to move under
Rule 50(a) at trial "wholly waives the right to mount any post-
trial attack on the sufficiency of the evidence." Yohannon v.
Keene Corp., 924 F.2d 1255, 1262 (3d. Cir. 1991). Defendant
argues that it is not challenging the sufficiency of the

Punitive damages are only available in "exceptional cases" involving "circumstances of aggravation and outrage, beyond the simple commission of a tort." Pavlova v. Mint Mgmt. Corp., 375 N.J. Super. 397, 404 (App. Div. 2005). Thus, to receive punitive damages under the NJLAD, a plaintiff must not only establish age discrimination as described above, but must additionally prove, by clear and convincing evidence, (1) actual participation in or willfull indifference to the wrongful conduct on the part of upper management and (2) that the offending conduct is

---

evidence, but its weight, which is a different question governed by a different standard.

Defendant is correct that the failure to move for judgment as a matter of law at trial does not foreclose a separate "weight of the evidence" challenge brought via Rule 59. Greenleaf v. Garlock, Inc., 174 F.3d 352, 365 (3d Cir. 1999). In this context, "sufficiency" refers to an inquiry into whether "the record contains the minimum quantum of evidence from which a jury might reasonably afford relief" for the nonmoving party. Keith v. Truck Stops Corp. of America, 909 F.2d 743, 745 (3d Cir. 1990). This is a question of whether a party has done enough that a jury could, as a matter of law, reasonably find for that party. The question of weight of the evidence, however, provides not for an evaluation of whether a party has done the minimum required to present its case to the jury, but rather calls for the Court to "exercise its discretion and grant a new trial because the probative evidence in favor of the movant as contrasted with that opposed to it is overwhelming," such that allowing the verdict to stand would "result[] in a miscarriage of justice or . . . shocks [the court's] conscience." Vargo v. Coslet, 126 F. App'x 533, 535 (3d Cir. 2005) (citing Greenleaf, 174 F.3d at 365); Williamson, 926 F.2d at 1353.

especially egregious. Rendine v. Pantzer, 141 N.J. 292, 313-14 (1995) (citing Lehman v. Toys-R-Us, 132 N.J. 587 (1993)); Leimgruber v. Claridge Assocs., 73 N.J. 450, 454 (1977); (Dkt. No. 106 at 2).

### 1. Participation or Willful Indifference

The Court instructed the jury that in order to award Plaintiff punitive damages it had to first determine, among other things, that "at least one of Lockheed Martin Corporation's 'upper management' employees actually participated in, or was willfully indifferent to, the wrongful conduct." (Dkt. No. 106 at 3; Tr. 748:18-22); see George v. Bd. of Educ. of the Twp. of Millburn, 34 F. Supp. 3d 442, 462 (D.N.J. 2014) (citing Cavuoti v. N.J. Transit Corp., 161 N.J. 107, 113 (1999); Rendine, 141 N.J at 314). The jury was further instructed that this required them to find that a member of upper management "knew about the wrongful conduct" and either "engaged in affirmative acts to accomplish [it]" or "chose to disregard or ignore it, rather than stop it." (Dkt No. 106 at 3-4; Tr. 752:24-753:12).

Plaintiff identified Norm Malnak as an example of a member of Lockheed's "upper management" on whom the jury should focus its inquiry because Plaintiff presented his case for punitive

damages based upon Malnak's actions.[12] Defendant argues that the jury's decision on the issue of "actual participation" or "willful indifference" of "upper management" is so contrary to the weight of the evidence that allowing it to stand would be a miscarriage of justice. The Court agrees.

Malnak was the only member of Lockheed's "upper management" identified at trial who could have played some role in Plaintiff's termination. As noted, Malnak was the Vice President in charge of "Tech Ops" for MS2, the unit in which Plaintiff worked, at the time Plaintiff was terminated. There was little evidence presented at trial with regard to Malnak.

To be sure, however, Malnak's name -- along with the names of several other vice presidents and directors -- was on the title slide of the RIF Analysis.[13] (See PTX-19). As previously

---

[12] The parties do not dispute whether Malnak could properly be categorized as "upper management." When asked at sidebar "Who is the upper management that you want me to identify?" Plaintiff's counsel responded "Norm Malnak." (Tr. 750:17-20).

[13] Plaintiff contends that that the individuals listed on this slide -- Jon Baumgart, Michael Cseplo, Mark DiNapoli, Marilyn Figlar, Norm Malnak, Maryann Marandola, Mimi Morino, Warren Pfister, Tom Spair, Diane Stefani, and Shelley Walker -- were the "architects" of the RIF. He singles out Marilyn Figlar, the VP of HR for MS2 whose name also appears on the slide. The only testimony regarding Ms. Figlar presented at trial was the fact of her position and that she reported to Norm Malnak. Plaintiff did not elicit testimony or present evidence regarding any of these individuals' involvement in either creating or implementing the RIF.

discussed, the jury could have concluded that the RIF Analysis contained the "blueprint" for a discriminatory plan to remove older employees while simultaneously increasing the number of younger employees. Putting aside the fact that the evidence with respect to Plaintiff went further than just this "blueprint," Plaintiff offered no evidence of Malnak's involvement in planning the RIF other than his name on the title page of this presentation. Standing alone, Malnak's name on the title slide of this Powerpoint presentation is not clear and convincing evidence of "active participation" in or "willful indifference" to discrimination.

The RIF Analysis served as one piece of circumstantial evidence of discrimination. What made this plan worse in Plaintiff's case and formed another crucial piece of circumstantial evidence in establishing discrimination as to Plaintiff's termination, however, was the improper use of the RIF process, specifically the placement of Plaintiff into a COI by himself. Given the testimony surrounding Plaintiff's placement into a COI of one, and specifically in light of Plaintiff's testimony related to contrived review scores, such conduct could easily be viewed by a jury as discriminatory.

The problem here is that Plaintiff presented no evidence that Malnak, or any other member of "upper management,"

participated or even knew about his COI placement or reviews. In fact, the uncontested evidence at trial established that it was Renna who placed Plaintiff into his COI. Renna testified that pursuant to the RIF Schedule (which the jury was free to believe that Defendant did not follow in terminating Plaintiff), the decision as to which "skill groups/COIs are affected by the RIF" would have been "reviewed up the line to Norm Malnak." (Tr. 128:11-21). This does not establish, however, by clear and convincing evidence that Malnak took part in the decision to place Plaintiff in a COI of one or was even aware of the reasons for such placement. An equally plausible conclusion is that this evidence might establish that Malnak was negligent in failing to discover that Plaintiff had been terminated for a discriminatory reason. As the jury was instructed, however, the standard for an award of punitive damages under the NJLAD requires more than mere negligence. (Dkt. No. 106 at 4; Tr. 753:9-18); <u>Lehmann</u>, 132 N.J. at 624.

In the end, the Court concludes that the weight of the evidence on this issue clearly favors Defendant, the jury's verdict shocks this Court's conscience, and allowing it to stand would constitute a miscarriage of justice. Accordingly, the Court will vacate the jury's punitive damage award and order that a new trial be held on punitive damages.

Because a new trial on the issue of punitive damages is warranted on this ground alone, the Court need not reach the issues of "especially egregious conduct" or the admission of Plaintiff's testimony.

**IV.  Remittitur**

Defendant seeks remittitur of the jury's awards of emotional distress and punitive damages. Because the court has granted Defendant's motion for a new trial on the issue of punitive damages, it will only address emotional distress damages.

a. Legal Standard

The use of remittitur "falls within the discretion of the trial judge." Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 354 (3d Cir. 2001)(citation omitted). The Court has an "obligation . . . to ensure that the compensatory damage award finds support in the record and that the jury did not abandon analysis for sympathy." Id. at 352 (citing Gumbs v. Pueblo International, Inc., 823 F.2d 768, 773 (3d Cir.1987)). Remittitur is warranted where the Court "finds that a decision of the jury is clearly unsupported and/or excessive." Cortez v. Trans Union, LLC, 617 F.3d 688, 715 (3d Cir. 2010)(quoting Spence v. Bd. of Educ. of Christina School Dist., 806 F.2d 1198, 1201 (3d Cir. 1986)).

A court must, however, "uphold the jury's award, if there exists a reasonable basis to do so" and "may not . . . reduce [an] award merely because it would have granted a lesser amount of damages." Blakey v. Continental Airlines, Inc., 992 F. Supp. 731, 734 (D.N.J. 1998)(quoting Motter v. Everest & Jennings, Inc., 883 F.2d 1223, 1230 (3d Cir. 1989)). "[A] federal court will only grant a remittitur . . . if it appears that the award is so large as to 'shock the conscience of the court.'" Glass v. Snellbaker, No. 05-1971 JBS, 2008 WL 4371760, at *7 (D.N.J. Sept. 17, 2008).

b. Emotional Distress Damages

Defendant argues that the jury's award of $520,000 in emotional distress damages should be reduced because it is excessive in light of the evidence presented at trial. As stated above, this Court will only remit the jury's verdict if it "shocks the conscience" of the Court. Id. Because Plaintiff's entitlement to recovery for emotional distress arises from the NJLAD,[14] this Court will look to New Jersey state law for

---

[14] "[T]he ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress." C.I.R. v. Schleier, 515 U.S. 323, 326 n. 2 (1995). The NJLAD, however, does permit for recovery of emotional distress damages, see N.J.S.A. § 10:5-3, and New Jersey law determines the type of evidence that must be introduced to warrant such an award. Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 278 (1989).

guidance on the question of "excessiveness." See Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)("the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.").

Defendant urges this Court to decide whether the award of emotional distress damages in this case "shocks its conscience" by comparing it to verdicts in "similar cases." (Def. Br. at 26 (citing Dee v. Burough of Dunmore, No. 05-1342, 2010 WL 1626908, at *3 (M.D. Pa. Apr. 21, 2010), aff'f, 474 F. Appx. 85 (3d Cir. 2012)). The Supreme Court of New Jersey, however, directly repudiated such an approach in Cuevas v. Wentworth Group, 226 N.J. 480 (2016), holding that "reliance on . . . purportedly comparable verdicts presented by the parties in deciding whether to remit a pain-and-suffering damages award [under the NJLAD] . . . is not sound in principle or workable in practice." 226 N.J. at 486. The court "disapprove[d] of the comparative-verdict methodology . . . [because] [t]he singular facts and particular plaintiffs in different cases that lead to varying awards of

_____

damages are not easily susceptible to comparison." Id.

The court noted that "[i]n a case of workplace discrimination in violation of the [NJ]LAD, jurors are asked to exercise a high degree of discernment, through their collective judgment, to determine the proper measure of damages for emotional distress, which includes 'embarrassment, humiliation, indignity, and other mental anguish.'" Id. at 500 (citing Model Jury Charges (Civil) § 2.36, "Past and Future Emotional Distress in an Employment Law Case" (2014)).[15] In fact, the jurors in such cases are instructed (as they were here) to use their "common experience" and "human judgment" to equate "the nature of emotional distress . . . and the nature and function of money . . . [and] arrive at a fair and reasonable award of damages." Id. Because of the nature of such an analysis, "no two juries likely will award the same damages for emotional distress in a discrimination case, [and] a permissible award [of emotional distress damages in an NJLAD case] may fall within a wide spectrum of acceptable outcomes." Id. The court held that only an award well outside of that "acceptable broad range" will be so excessive as to "shock the conscience." Id.

---

[15] The jury charges in this case, which were submitted jointly by the parties, used the same language. (Tr. 704:14-23).

In determining this "acceptable range," the court held that "courts should focus their attention on the record of the case at issue . . . [because] the facts and plaintiffs in every . . . [NJ]LAD case are fundamentally different and therefore a true comparative analysis is illusory." Id. at 505-06. Further, according to the court, "the realization that a wide range of potential awards is permissible counsels for judicial restraint" and "the instances in which a remittitur should be granted will be glaring and obvious from the record." Id. at 509.

In light of the Cuevas court's admonition, in 2016, that a "wide range" of awards is acceptable, the cases cited by Defendant, all of which were decided before Cuevas, are not particularly instructive.

Plaintiff testified regarding the emotional distress he suffered after his termination from Lockheed.[16] Plaintiff, who was 66 years old at the time of his termination, had been working in engineering since he was 16. (Tr. 204:20-21). He

---

[16] Plaintiff also testified regarding his treatment at Lockheed for the 10 years before his termination. As discussed above, he testified that in 2002, he was informed that Jay Hansen had made an age discriminatory remark about "getting rid of him." Plaintiff also testified that he he had been receiving contrived review scores, and that on at least one occasion this led him to complain to Judd that he was being discriminated against. The jury could have considered this evidence in the context of evaluating the credibility and severity of Plaintiff's emotional distress.

further testified that he was raised in the culture of engineering, and that both his father and grandfather had been engineers. (<u>Id.</u> at 145:18-21). According to Plaintiff, he intended to continue working "forever," but instead of doing so, or even retiring on his own terms, he was taken into an office, handed a form letter, and then escorted out of the premises by security guards. (<u>Id.</u> at 187:21-188:11; 201:20-22).

Plaintiff also testified that when he was fired in this manner after nearly 30 years at Lockheed, he felt betrayed, depressed, and shocked. (<u>Id.</u> 199:19-24). He testified that he attempted to find a new job, but failed, and that he was frustrated and demoralized by the process. (<u>Id.</u> at 203:19-204:3). Finally, Plaintiff testified that his termination affected his personal life. He testified that his relationships with his family and friends have changed since he was terminated and unable to find new employment. (<u>Id.</u> at 204:4-17) Plaintiff testified that his social life revolved largely around his work at Lockheed, and that since his termination he has become lonely. (<u>Id.</u>)

The jury was properly instructed that it should

consider the nature, character and seriousness of any
emotional distress. You must also consider the
duration of the emotional distress, as any award you
make must cover the damages suffered by Mr. Braden to
the present time.

Mr. Braden has the burden of proving his damages
through credible competent evidence, although he does
not have to offer any witnesses to corroborate his
emotional distress. The distress need not be
permanent, physical or psychological symptoms are not
necessary, and Mr. Braden need not have obtained any
type of professional treatment.

Mr. Braden's testimony standing alone is enough to
support an award of emotional distress damages. On the
other hand, you are free to disbelieve all or part of
Mr. Braden's testimony, and if you do, you should act
accordingly by either reducing the amount of damages
you award for emotional distress or by not awarding
any emotional distress damages at all.

The law does not provide you with any table, schedule
or formula by which a person's emotional distress may
bemeasured in terms of money. The amount is left to
your sound discretion. You are to use your discretion
to attempt to make Mr. Braden whole, so far as money
can do so, based upon reason and sound judgment,
without any passion, prejudice, bias or sympathy.

(Tr. 704:24-705:23).

The jury heard Plaintiff's testimony, observed his

demeanor, and decided that he was suffering from serious

emotional distress. Accordingly, it awarded him $520,000 in

emotional distress damages. While this award is large, the Court

does not find that the jury's award of damages for emotional

distress is so far outside the "acceptable broad range" of

awards that it shocks the conscience. Accordingly, Plaintiff's motion for remittitur on emotional damages shall be denied.[17]

### V.    Conclusion

For the foregoing reasons, Defendant's Motion for Judgment as a Matter of Law shall be DENIED, Defendant's Motion for Remittitur of emotional damages shall be DENIED, and Defendant's Motion for a New Trial shall be GRANTED, in part, and DENIED, in part. The jury's award of punitive damages will be vacated and a new trial shall be held on the issue of punitive damages. An appropriate Order shall issue herewith.


_s/_Renee Marie Bumb
RENÉE MARIE BUMB
United States District Judge

DATED: December 18, 2017

---

[17] At the close of its argument on remittitur, Defendant "requests the [C]ourt grant a remittitur of the jury's emotional distress damage award or, in the alternative, order a new trial." (Def. Br. at 30). The Court's denial of Defendant's request for remittitur forecloses the possibility of the award of a new trial. The Court's holding that the jury's verdict on this issue was "supported by the evidence," Cortez v. Trans Union, LLC, 617 F.3d 688, 716 (3d Cir. 2010), necessarily indicates that it was not against the clear weight of the evidence.